Date signed January 13, 2009



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
#### at Greenbelt

| | |
|---|---|
| In Re:<br><br>**CHARLES H. SPENCE,** *et al.*,<br><br>Debtors. | Case No. 05-90478PM<br>Chapter 13 |
| **W. CLARKSON McDOW, JR.,**<br>**UNITED STATES TRUSTEE,**<br>Plaintiff,<br>v.<br><br>**THE AMERICAN DEBT FREE**<br>**ASSOCIATION, INC.,**<br>Defendant. | AP No. 07-00854PM (LEAD AP)<br><br>AP Nos. 07-00852 through 07-00861,<br>07-00863 through 07-00873, 07-00875<br>through 07-00898 |

### MEMORANDUM OF DECISION

These proceedings came before the court for trial on July 30, 2008, on the Complaint of the United States Trustee ("UST") Seeking Civil Penalties, Injunctive and Other Miscellaneous Relief filed against The American Debt Free Association, Inc. ("TADFA"). After careful review of the record and the argument of the parties, the court submits the following findings of facts and conclusions of law.

## Background

### A. Procedure

The UST filed Complaints on November 1, 2007, in 45 adversary proceedings.[1]  These proceedings were consolidated for trial, the case of Charles H. Spence, Case No. 05-90478PM, Adversary Proceeding No. 07-00854PM, being the lead case procedurally.  The Complaints state seven causes of action – two related to 11 U.S.C. § 526 (restrictions on debt relief agencies) and five related to 11 U.S.C. § 110 (penalties for persons who negligently or fraudulently prepare bankruptcy petitions).[2]  Section 526 and the applicable part of § 110 were created by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") that was signed into law on April 20, 2005.  Following this court's Order entered February 5, 2008, denying a motion to dismiss the Complaints, TADFA filed a general denial of the material allegations of the Complaints and affirmatively raised an issue of the constitutionality of the relevant sections of the Bankruptcy Code.[3]

---

[1]  By Stipulation approved by this court on June 10, 2008, Counts I and II of the Complaints were dismissed as to Adversary Proceeding Nos. 07-00896 (Broadus), 07-00889 (Garris), 07-00857 (Hayes), 07-00892 (Montgomery) and 07-00880 (Shields).

[2]  Unless otherwise designated, all statutory references are to Title 11 of the United States Code.

[3]  Specifically, TADFA asserted that:

The provisions . . . that the U.S. Trustee attempts to enforce against TADFA are unconstitutional under the First and Fifth Amendments of the United States Constitution.  BAPCPA's limitations on TADFA's communications with its customers violate TADFA's free speech rights and are unconstitutionally vague and over-broad and BAPCPA violates the due process and equal protection provisions of the Constitution.

The court's analysis on this issue will follow, infra.  The court notes that by its Post-Trial Brief, TADFA clarified that §§ 527 and 528 allegedly restrict its First Amendment right to free speech. (Dkt. No. 51).

At trial, the UST offered hundreds of exhibits and the testimony of six witnesses. TADFA offered ten exhibits and two witnesses, its manager and president, Curtis B. Uhre ("Uhre"), who incorporated TADFA in late 2001 (Tr. p. 168, l. 8), and its operations manager, Sabrina Tracey ("Tracey"). Objections to exhibits were filed by the parties. (Dkt. Nos. 45, 47). After review of the documents, the court admits all into evidence.[4] TADFA's oral motion for judgment in its favor made immediately following the UST's presentation, the court having deferred ruling, will be denied.

## B. Facts

This dispute involves 45 similarly-situated debtors who engaged TADFA. In the 45 cases, when presented with choices, all of the debtors opted to file a bankruptcy case. Thirty-two of the 45 cases were filed under Chapter 13, the others filed under Chapter 7.

The court will use the circumstances of Sandra Hayes ("Ms. Hayes"), the debtor in Case No. 06-11265PM, in discussing the underlying facts.[5] The facts of her case are typical.

On November 10, 2005, Uhre, on behalf of TADFA, solicited Ms. Hayes by letter. (UST 1).[6] Emphasized by a bullet point, TADFA offered the following:

> You may be able to get rid of this debt and your other credit card bills, repossessions and medical bills. If you qualify, your debt can become ZERO. And, you can stop lawsuits, garnishments and foreclosures.

---

[4] TADFA objected to the UST's Exhibit Nos. 18, 28, 38, 48, 58, 68, 78, 88, 98, 108, 118, 128, 138, 148, 158, 168, 178, 188, 198, 208, 218, 228, 238, 248, 258, 268, 278, 288, 298, 308, 318, 328, 338, 348, 358, 368, 378, 388, 398, 408, 418, 427, 437, 446 and 456. These exhibits represented summaries prepared by an employee of the Office of the UST, Terry Miller, who also testified at trial. The UST objected to TADFA's Exhibit Nos. 1, 2, 5, 6, 7 and 9. Exhibit 1 was admitted at trial.

[5] The court is aware that, by Stipulation, the parties dismissed Counts I and II of the Complaint as to Ms. Hayes. This is irrelevant to the court's factual discussion.

[6] Solicitation letters were directed to defendants in pending lawsuits. (Tr. p. 28, l. 18).

> Your credit will usually improve so that you can buy a car in 3 months or a house in the next 2 years.  **Yes, even under the new laws you probably qualify for Bankruptcy**.  Most of the time, people keep their car, house and other property and still wipe out or reduce their bills.

(UST 1).

Enticed, Ms. Hayes contacted TADFA, speaking with one of two TADFA employees, either Uhre or Tracey.[7]  She was presented options – to settle the debt, to file a bankruptcy case or to be referred to counsel.  As explained by Tracey at trial:

> Usually what we discuss is the lawsuit that is at hand, why they're being sued; what do they want to do with that situation, whether they want to work out a payment plan, a lump sum settlement.  Then in discussion we ask is this the only debt that they have. If it's not, then maybe they can't afford to pay the debt back, so we do a quick analysis of their debt as a whole and then look into whether a bankruptcy would be beneficial to them.

(Tr. p. 32, l. 4-12).

> If there are any cases where a person would need legal counsel, we would refer them to our attorney, Adam Freiman's office, to represent them in court should they need representation in court.

(Tr. p. 32, l. 19-22).

After Ms. Hayes selected the bankruptcy option, TADFA forwarded to her its "bankruptcy brochure."  (Tr. p. 34, l. 18)  This brochure set forth on the first page a listing of "Your Benefits" that included the stopping of garnishments, foreclosures, lawsuits, harassment and evictions, an obvious reference to the automatic stay of

---

[7] Uhre testified that in 2005 and 2006, he and Tracey were TADFA's only employees.  (Tr. p. 168, l. 15-16).

§ 362(a), as well as obtaining a "fresh start," the very essence of the bankruptcy discharge.[8]  (UST 4).

Upon TADFA's receipt of initial payment, it sent a December 2005, letter to Ms. Hayes setting forth the payment arrangement and thanking her for choosing TADFA to assist her "with a Bankruptcy." (UST 213).[9]  The fee charged "for providing the bankruptcy plan" to Ms. Hayes was $1,495.00 with an initial payment of $300.00.[10]  (UST 213).  The letter further provided that:  "Our attorneys have many years of bankruptcy experience and will provide you with all necessary legal assistance for filing your bankruptcy petition." (UST 213).  Included as an enclosure was TADFA's "Bankruptcy Information and Workbook" ("Workbook").  Ms. Hayes was directed to complete the Workbook and return it to TADFA so that TADFA could "proceed with [her] bankruptcy filing[.]" (UST 213).  Her completed Workbook appears at UST 214.[11]

---

[8]  An updated version of the brochure appears at UST 461.  TADFA removed the list of benefits and identified itself as a debt relief agency that helps "people file for bankruptcy under the Bankruptcy Code."

[9]  Similar letters appear at UST 13 (Alam), 23 (Alston), 33 (Baens), 43 (Baker), 53 (Beck), 63 (Bennett), 73 (Bittinger), 83 (Capshaw), 93 (Cardoso), 103 (Castellanos), 113 (Dewarf), 123 (Domer), 133 (Durbin), 143 (Fazenbaker), 153 (Forker), 163 (Franklin), 173 (Garris), 183 (Goad), 193 (Green), 203 (Hardrick), 223 (Jae), 233 (Jones-Sanders), 243 (Junior), 253 (Laperle), 263 (Momaiya), 273 (Montgomery), 283 (Broadus/Moore), 293 (Nicaragua), 303 (Pryor), 313 (Paton), 323 (Reynolds), 333 (Robinson), 343 (Shields), 353 (Sinclair), 363 (Siron), 373 (Spence), 383 (Steve), 393 (Stiles), 403 (Turner), 413 (Vance), 432 (Will), 451 (Woingust).  The court notes that there are differing versions of this letter.  Specifically, some letters referenced "court filing fees" that exceeded the statutory amount effective at the pertinent times while others made no reference to a filing fee amount.  Testimony at trial clarified that the actual filing fee was not being disclosed by TADFA and that there existed an additional administrative fee to counsel ($100.00).  (Tr. pp. 176-177).  An updated version of this letter appears at UST 463 and 464.

[10]  According to Tracey, the bankruptcy option required an initial payment of $325.00.  (Tr. p. 36, l. 10).  The total cost for TADFA's bankruptcy option at the relevant time was approximately $1,595.00 (Tr. p. 36, l. 18) that could be paid over time.  (Tr. p. 37, l. 2-3).  All of the debtors were admonished that no cases would be filed with the bankruptcy court until TADFA received full payment of its fee.  (Tr. p. 47, l. 21).

[11]  This Workbook appears in substantially the same form at UST 14 (Alam), 24 (Alston), 34 (Baens), 44 (Baker), 54 (Beck), 64 (Bennett), 74 (Bittinger), 84 (Capshaw), 94 (Cardoso), 104 (Castellanos), 114 (Dewarf), 124 (Domer), 134 (Durbin), 144 (Fazenbaker), 154 (Forker), 164

The second page of the Workbook requested copies of various documents, including pay stubs, deeds, promissory notes and deeds of trust, the last monthly statement for every loan secured by the property, car titles, tax returns, legal correspondence, foreclosure notices, court papers and foreclosure notices.  The client was instructed to retain originals of all documents and to send photocopies as TADFA would retain copies in a "permanent bankruptcy file."  (UST 214, p. 2). Photocopies of credit reports ordered by TADFA for the debtors were also requested. The page following is akin to a Voluntary Petition, requesting personal information, including a social security number and information regarding prior bankruptcy cases.  There are boxes to select whether the bankruptcy case is to be filed under Chapter 7 or Chapter 13.  (UST 214, p. 3).

On the Workbook's "Schedule A: Real Property," TADFA requested specific information about, among other things, real estate ownership, loans and account numbers and payment information, as well as whether monthly payments were current.  (UST 214, p. 4).   Ms. Hayes was asked whether she wanted to retain the listed property or surrender it.  (UST 214, p. 4).

Page five of the Workbook sought information regarding vehicles.  (UST 214, p. 5).  "Schedule B: Other Assets" is modeled after Official Bankruptcy Form B6B as it requested information regarding personal property.  (UST 214, pp. 6-7).

The Workbook's "Schedule C: Priority creditors" advised that "Some taxes, fines, penalties, bad checks, child support, alimony, and most student loans are not dischargeable in a bankruptcy; however, the debt must be listed on the bankruptcy schedules[.]" (UST 214, p. 8).  Ms. Hayes was then requested to provide information

---

(Franklin), 174 (Garris), 184 (Goad), 194 (Green), 204 (Hardrick), 224 (Jae), 234 (Jones-Sanders), 244 (Junior), 254 (Laperle), 264 (Momaiya), 274 (Montgomery), 284 (Broadus/Moore), 294 (Nicaragua), 304 (Pryor), 314 (Paton) , 324 (Reynolds), 334 (Robinson), 344 (Shields), 354 (Sinclair), 364 (Siron), 374 (Spence), 384 (Steve), 394 (Stiles), 404 (Turner), 414 (Vance), 423 (Ward), 433 (Will), 442 (Winpisinger), 452 (Woingust).  The court notes that some of the Workbooks included differing total page numbers and others included lists of credit counselors.

UST 459 and 460 represent updated Workbooks.  Among other changes, the title is "Financial Information Workbook" and there is a disclosure that TADFA is a debt relief agency.

regarding federal and state taxes, child support, alimony and student loans and directed to "Please list any other priority debts on a separate sheet." (UST 214, p. 8).

"Schedule D: Unsecured Creditors" of the Workbook sought information regarding, to list a few examples, credit cards, personal loans, medical and dental bills. (UST 214, p. 9-15). In underlined text, the following statement appeared: "Failure to list the names and addresses of all of your creditors may result in an additional charge to you for preparing your Bankruptcy petition." (UST 214, p. 9). In bold text, the following statement appeared: "**Any debt not listed on these pages may not be discharged by your bankruptcy.**" (UST 214, p. 9).

The Workbook's "Schedule E: Secured creditors" sought information about creditors holding secured claims. (UST 214, p. 16). This legal concept was explained to Ms. Hayes in bold print as follows: "**(example: furniture accounts, jewelry accounts, or any personal loans for which you pledged your car or household goods as collateral).**" (UST 214, p. 16). Again, Ms. Hayes was asked whether she wanted to retain the listed property or surrender it. (UST 214, p. 16).

"Schedule F: Leases" requested information from Ms. Hayes as to autos or apartments. (UST 214, p. 17). "Schedule G" requested information as to co-debtors, "persons that jointly owe a debt with you as a co-signor, guarantor or authorized user[.]" (UST 214, p. 18).

The Workbook's "Schedule H" addressed income. (UST 214, p. 18). Specific instruction as to whose information was required was provided. Thus, on page 18, TADFA advised Ms. Hayes: "**If you are married and not separated but are filing an individual petition, you still must list your spouse's income.**" (UST 214, p. 18). On page 19, "**If you are married and not separated but you are filing an individual petition, you still must list your spouse's income**." (UST 214, p. 19). Workbook "Schedule H" was separated by two sections, not-so-surprisingly titled "Schedule I: Monthly Income" and "Schedule J: Monthly Expenses." (UST 214, p. 19-20); see Official Bankruptcy Forms B6I and B6J.

-7-

The Workbook's "Statement of Financial Affairs" (UST 214, pp. 21-26) is virtually identical to the Official Bankruptcy Form B7 (Statement of Financial Affairs).  It does not include questions 19 through 25 of the Official Bankruptcy Form relating to partnerships, corporations, tax consolidation groups or pension funds that are generally irrelevant in consumer bankruptcy cases.

The following month, on January 30, 2006, Uhre sent another letter to Ms. Hayes.  (UST 215).   This form letter goes to TADFA clients who returned the completed Workbook and "completed [the] bankruptcy plan payments due TADFA." (Tr. p. 52, l. 9-12).  Therein, Ms. Hayes was advised as follows:

> Please call your bankruptcy attorney listed below to schedule a meeting and make arrangements for the preparation of your bankruptcy petition.  He has many years of bankruptcy experience and will provide you with all necessary legal assistance for filing your bankruptcy petition.  After you have reviewed and signed the bankruptcy petition, he will file it with the Bankruptcy Court.  You will need to pay any court filing fees directly to your attorney.

(UST 215).[12]  "Your bankruptcy attorney" was listed by Uhre as Adam M. Freiman ("Freiman") of the Law Office of Sirody, Freiman and Feldman, P.A. ("Sirody Firm").  (UST 215).  The letter also informed her that the Workbook had been forwarded to the Sirody Firm.

Ms. Hayes filed a petition initiating a bankruptcy case under Chapter 13 on March 9, 2006.  (Dkt. No. 1; UST 209).  There are differences from the information provided by Ms. Hayes in the Workbook (UST 214) to the Schedules and Statement

---

[12]  Similar letters appear at UST 15 (Alam), 25 (Alston), 35 (Baens), 45 (Baker), 55 (Beck), 65 (Bennett), 75 (Bittinger), 85 (Capshaw), 95 (Cardoso), 105 (Castellanos), 115 (Dewarf), 125 (Domer), 135 (Durbin), 145 (Fazenbaker), 155 (Forker), 165 (Franklin), 175 (Garris), 185 (Goad), 195 (Green), 205 (Hardrick), 225 (Jae), 235 (Jones-Sanders), 245 (Junior), 255 (Laperle), 265 (Momaiya), 275 (Montgomery), 285 (Broadus/Moore), 295 (Nicaragua), 305 (Pryor), 315 (Paton), 325 (Reynolds), 335 (Robinson), 345 (Shields), 355 (Sinclair), 365,(Siron), 375 (Spence), 385 (Steve), 395 (Stiles), 405 (Turner), 415 (Vance), 424 (Ward), 434 (Will), 443 (Winpisinger), 453 (Woingust).  In some instances, TADFA advised the debtors of missing information required for the bankruptcy filing.  UST 95 (Cardoso), 135 (Durbin), 385 (Steve).

of Financial Affairs that appear on this court's docket.[13]  (Dkt. No. 1; UST 210-211, 218).  For one, Official Bankruptcy Form B6C (Schedule C.  Property Claimed as Exempt) was added.  Freiman signed the Voluntary Petition.  (Dkt. No. 1; UST 209).  The portion of the Voluntary Petition requiring that a bankruptcy petition preparer disclose its information was blank.  Id.

Question No. 9 (Payments related to debt counseling or bankruptcy) of Ms. Hayes' Statement of Financial Affairs disclosed the following payment information for consultation concerning "relief under the bankruptcy law or preparation of the petition in bankruptcy":

| | | |
|---|---|---|
| TADFA | 02/06 | $1495.00 |
| Adam M . Freiman, PA | 03/06 | $375.00 to atty from TADFA per debtor's prepaid plan, $100 from client. |

(Dkt. No. 1; UST 211).

Freiman's "Disclosure of Compensation of Attorney for Debtor(s)" stated that for legal services, he agreed to accept from Ms. Hayes $4,500.00.  Prior to the filing of the case, Freiman disclosed receipt of $975.00, $620.00 (sic) of which was received from TADFA "per debtor's prepaid plan" and the remaining $375.00 from Ms. Hayes.  Ms. Hayes was to be responsible for the balance to Freiman of $3,525.00 by payments through her Chapter 13 Plan.  (Dkt. No. 4; UST 212).  Thus, Ms. Hayes paid in excess of $5,000.00 for her Chapter 13 bankruptcy case, including

---

[13]   This is true as to all of the Schedules and Statement of Financial Affairs filed by the debtors as reflected by the summaries prepared by the UST.  UST 18 (Alam), 28 (Alston), 38 (Baens), 48 (Baker), 58 (Beck), 68 (Bennett), 78 (Bittinger), 88 (Capshaw), 98 (Cardoso), 108 (Castellanos), 118 (Dewarf), 128 (Domer), 138 (Durbin), 148 (Fazenbaker), 158 (Forker), 168 (Franklin), 178 (Garris), 188 (Goad), 198 (Green), 208 (Hardrick), 228 (Jae), 238 (Jones-Sanders), 248 (Junior), 258 (Laperle), 268 (Momaiya), 278 (Montgomery), 288 (Broadus/Moore), 298 (Nicaragua), 308 (Pryor), 318 (Patton), 328 (Reynolds), 338 (Robinson), 348 (Shields), 358 (Sinclair), 368 (Siron), 378 (Spence), 388 (Steve), 398 (Stiles), 408 (Turner), 418 (Vance), 427 (Ward), 437 (Will), 446 (Winpesinger), 456 (Woingust).

the filing fee.[14]   Ms. Hayes' Amended Plan providing for 60 monthly payments of $425.00 was confirmed by Order entered September 8, 2006.  (Dkt. No. 20).  The case remains open.

As previously noted, Ms. Hayes' experience was similar to that of the other debtors.  For the right of participation in TADFA's "bankruptcy payment plan," the debtors paid to TADFA from $995.00 to $1,495.00.  In the 45 cases at issue, all were subsequently referred to the Sirody Firm.  In all of the cases, the Sirody Firm input information from the Workbooks into typed forms that were filed.  The pivotal query for this court is: What service did TADFA provide to these debtors in exchange for the compensation it received?

## Analysis

## A.  Debt Relief Agency Counts (Counts I and II)

Section 526, "Restrictions on debt relief agencies," was added by the passage of the 2005 Act and became effective as to cases filed on and after October 17, 2005.

---

[14]    According to TADFA, Ms. Hayes paid it $1,495.00. (UST 213).  According to Freiman's Disclosure of Compensation, he charged Ms. Hayes an additional $4,500.00, $375.00 of which was said to have come from Ms. Hayes and $620.00 from TADFA on behalf of Ms. Hayes.  (Dkt. No. 4). The filing fee at the time was $189.00.  The balance to be paid through the Chapter 13 Plan is incorrect as the amount received prior to the filing of the case should have been $995.00 rather than $975.00.  Further, the information on the Statement of Financial Affairs does not comport with Freiman's Disclosure of Compensation.  Therefore, the court cannot calculate the exact amount Ms. Hayes paid to TADFA and the Sirody Firm for her filing.

The court reviewed each of the debtors' answers to Question 9 on the Statement of Financial Affairs and the Disclosures of Compensation filed by the Sirody Firm.  The court found numerous inconsistencies between the answers on the Statements of Financial Affairs to the information disclosed on the Disclosures of Compensation.  Indeed, in some of the cases, TADFA was not disclosed on the Statements of Financial Affairs.  UST 81 (Capshaw), 111 (Dewarf), 221 (Jae), 261 (Momaiya), 361 (Siron), 401 (Turner).  In the case of Thomas R. Pryor, Case No. 06-13245, the $1,000.00 paid to TADFA was disclosed on the Disclosure of Compensation as a "membership credit."  UST 302. Generally, the Sirody Firm disclosed TADFA's contribution as pursuant to a debtor's "prepaid plan." The impression given by this statement is that the payment is made pursuant to a legal services agreement such as contained in some collective bargaining contracts.  The fact is that the arrangement seems far more akin to a sharing of compensation that is barred by § 504(a).

-10-

Critical to the application of § 526 and its counterparts (§§ 527 and 528) are the definitions of the terms "assisted person," "bankruptcy assistance" and "debt relief agency." The court agrees with the observation found in COLLIER ON BANKRUPTCY ¶ 526.01[3], p. 526-6 (15th ed. rev. 2008):

> Although the expressed intent of Congress in enacting Section 526 and related provisions was to improve the conduct of professionals and others who assist consumer debtors with their bankruptcy cases, each of these definitions contain imprecise language that create problems in application (citations omitted).

Section 526(a) provides:

(a) A debt relief agency shall not–

> (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;

> (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue and misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;

> (3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to–

>> (A) the services that such agency will provide to such person; or

>> (B) the benefits and risks that may result if such person becomes a debtor in a case under this title; or

> (4) advise an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer fee or charge for services performed as part of preparing for or representing a debtor in a case under this title.

The three pertinent definitions appear at § 101(3), (4A) and (12A) and, in pertinent part, provide:

> (3) The term "assisted person" means any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $150,000.00.[15]

> (4A) The term "bankruptcy assistance" means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title.

> (12A) The term "debt relief agency" means any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, or who is a bankruptcy petition preparer under section 110[.]

A person[16] may be rendered a "debt relief agency" if it provides <u>any</u> "bankruptcy assistance" to an "assisted person" in return for the payment of money <u>or</u> it is a petition preparer under § 110.  It is without question that TADFA was at the pertinent time a "debt relief agency" and now is a self-proclaimed "debt relief agency."  (UST 459-461, 463-464).

TADFA provided "bankruptcy assistance."  Its service for those clients pursuing the "bankruptcy option" was to provide information (the Workbook), advice (telephone or in-person consultations) and counsel ("our attorneys," Freiman and the Sirody Firm).[17]  As explained by Uhre, "We provide people when there

---

[15]  This dollar amount was adjusted by the Judicial Conference of the United States to $164,250.00 pursuant to 11 U.S.C. § 104(a) (change effective in three-year intervals).

[16]  <u>See</u> § 101(41).

[17]  The court notes that § 101(4A) is phrased in the disjunctive.  It has purposefully omitted discussion regarding document preparation and filing for its analysis with respect to § 110.

doesn't appear to be any other alternative with a bankruptcy option." (Tr. 169, l. 22-23). That option, according to Uhre, entailed:

> Well, we basically, after reviewing the financial information, go over with the client the options that they have, the amount of dollars that roughly it's going to take if they were to set up a monthly payment plan with the creditor or creditors, whatever the case may be, and look at their situation to see if those amounts of money are available. I think we spend a lot of time helping people understand their financial situation and their financial situation as it relates to the numbers so to speak. After that, if it appears to be absolutely not an option for them to have the wherewithal to make a monthly payment or any other kind of payment on their settlements that would work for them within a time frame that makes sense, then we would sometimes discuss with them the option of doing the bankruptcy, that that might be an alternative that they would want to consider.

(Tr. 170, l. 1-17).

> Well, we would tell them in a general way that we have a bankruptcy program, the cost of which at the time here in question was approximately $1,495 which includes the cost of providing the attorney to provide the bankruptcy services for them; that they would need to fill out some information on a financial information workbook, if you would, I think is the term that's been used here today. We would order credit reports for the client and then ask that they return that information when they have completed it to us.

(Tr. 170, l. 17-25; Tr. 171, l. 1-5).

The "bankruptcy assistance" TADFA provided was to "assisted person[s]" as the debtors' debts consisted primarily of consumer debts and the value of their nonexempt property was less than the statutory cap.[18] The court was not swayed by TADFA's argument that a determination of whether a person is an "assisted person" would force TADFA to engage in the unauthorized practice of law. The court finds that TADFA employees did indeed delve into its clients' financial

_____

[18] The court again notes those over-the-limit debtors that the parties agreed were not "assisted person[s]."

-13-

situations and had the wherewithal to make an assessment of the financial landscape. Tracey testified that:

> Then in discussion we ask is this the only debt that they have. If it's not, then maybe they can't afford to pay the debt back, so we do a quick analysis of their debt as a whole and then look into whether a bankruptcy would be beneficial to them.

(Tr. p. 32, l. 8-12).

Uhre testified that TADFA employees looked at completed Workbooks "to see if any of the financial information had changed drastically from what they had initially told us[.]" (Tr. p. 175, l. 9-15). In some cases, financial information missing from the Workbook was requested by TADFA. (UST 95 (Cardoso), 135 (Durbin), 385 (Steve)). Although TADFA argues vehemently that the "assisted person" analysis is complicated and complex, Uhre testified of his qualifications and experience (Tr. p. 167-168), his grasp of complicated and complex financial situations and the training he provided to his employees. (Tr. p. 182, l. 16-20) (In response to a question regarding training of TADFA employees, Uhre responded: "It's the total understanding of everything and, as you well know, at Ginnie Mae I was one of two people in charge of working out a $2 billion program that had defaulted at the corporation and I was involved in workouts every single day there."). Further, without inquiry as to specific financial circumstances, TADFA could not have steered its prospective debtors into its "bankruptcy option."

The analysis as to who is an "assisted person" does not end here. Section § 526(a) uses the term "prospective assisted person" that is not defined. COLLIER ON BANKRUPTCY ¶ 526.01[3], p. 526-6 (15th ed. rev. 2008) explains:

> [T]he definition of the term 'prospective assisted person' is unclear. Although the term is used several times throughout this section, the term is not defined elsewhere in this section or elsewhere in the Bankruptcy Code. It will be left to the courts to define the meaning of the term.

The court cannot reconcile the definition of "assisted person" with the lack of definition of "prospective assisted person."  In two cases, <u>Milavetz, Gallop & Milavetz, P.A. v. United States</u>, 541 F.3d 785 (CA8 2008), and <u>McDermott v. Derrick Hills (In re Grissett)</u>, 2008 WL 4553083 (BC E.D.Mich. October 08, 2008), the terms are used interchangeably.  The court finds for the purpose of this opinion that a conversion from "prospective assisted person" to "assisted person" takes place upon the transfer of compensation.  Therefore, TADFA provided "bankruptcy assistance" to "assisted persons" rendering it a "debt relief agency."

Finding that TADFA falls within the scope of these consumer protection measures, the court finds, under § 526(a)(3), that TADFA misrepresented to these debtors its services as well as the benefits that may result if one became a debtor.  It led each and every one of its "bankruptcy option" clients to believe that <u>it</u> would be filing the bankruptcy cases and that <u>its</u> attorneys, not an outside law firm, would be assisting with same.[19]  Debtors Herbert Hardrick and Kimberly Montgomery testified that they believed that they would be dealing with TADFA and not outside counsel.  (Tr. 78, 101).  TADFA failed to admonish its clients pursuing the "bankruptcy option" that the actual filing did not come without further cost, a

---

[19]  UST 13 is one example of many others of its kind.  By this letter dated February 28, 2007, to Mohammed S. Alam, Tracey, in pertinent part, wrote:

> Thank you for requesting that The American Debt Free Association, Inc. (TADFA) assist you with a Bankruptcy.  **Our attorneys** have many years of bankruptcy experience and will provide you with all necessary legal assistance for filing your bankruptcy petition[.]
>
> * * * *
>
> Please fill out and complete the enclosed Bankruptcy information workbook and return it to us as soon as possible.  **We can not proceed with your bankruptcy filing until you have returned the workbook to us[.]**
>
> If any of your creditors are calling, **tell them you are filing for bankruptcy and give them the name and address of our organization[.]**

(emphasis added.)

material omission and blatant misrepresentation.  Also, TADFA, through ambiguous advertising and correspondence, dangled a "fresh start" before these debtors.  TADFA impressed upon these debtors that only a bankruptcy filing could provide a benefit.  Believing that that new beginning would be theirs after payment of TADFA's fee, they learned later that there was much more to the story.  TADFA's classic bait-and-switch tactic is the very type of conduct that prompted Congress to enact § 526 and its counterparts.  See § 227, H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 17 (2005).

Section 526 addresses the restrictions upon a debt relief agency as well as the remedies for violations.  Sections 527 and 528 address requirements imposed upon a debt relief agency.  As to § 527 (Disclosures), the UST failed to meet his burden that TADFA did not provide these debtors with the required disclosures.  With regard to § 528 (Requirements for debt relief agencies), TADFA failed to comply.  Section 528 provides:

(a) A debt relief agency shall–

(1) not later than 5 business days after the first date on which such agency provides any bankruptcy assistance services to an assisted person, but prior to such assisted person's petition under this title being filed, execute a written contract with such assisted person that explains clearly and conspicuously–

(A) the services such agency will provide to such assisted person; and

(B) the fees or charges for such services, and the terms of payment;

(2) provide the assisted person with a copy of the fully executed and completed contract;

(3) clearly and conspicuously disclose in any advertisement of bankruptcy assistance services or of the benefits of bankruptcy directed to the general public (whether in general media, seminars or specific mailings, telephonic or electronic messages, or otherwise) that

-16-

the services or benefits are with respect to bankruptcy relief under this title; and

(4) clearly and conspicuously use the following statement in such advertisement: "We are a debt relief agency. We help people file for bankruptcy relief under the Bankruptcy Code." or a substantially similar statement.

(b)(1) An advertisement of bankruptcy assistance services or of the benefits of bankruptcy directed to the general public includes–

(A) descriptions of bankruptcy assistance in connection with a chapter 13 plan whether or not chapter 13 is specifically mentioned in such advertisement; and

(B) statements such as "federally supervised repayment plan" or "Federal debt restructuring help" or other similar statements that could lead a reasonable consumer to believe that debt counseling was being offered when in fact the services were directed to providing bankruptcy assistance with a chapter 13 plan or other form of bankruptcy relief under this title.

(2) An advertisement, directed to the general public, indicating that the debt relief agency provides assistance with respect to credit defaults, mortgage foreclosures, eviction proceedings, excessive debt, debt collection pressure, or inability to pay any consumer debt shall–

(A) disclose clearly and conspicuously in such advertisement that the assistance may involve bankruptcy relief under this title; and

(B) include the following statement: "We are a debt relief agency. We help people file for bankruptcy relief under the Bankruptcy Code." or a substantially similar statement.

TADFA did not execute a written contract with its "bankruptcy option" clients. § 528(a)(1).  Its letter (see n. 9, supra) cannot be regarded as such. Accordingly, TADFA also did not provide to its clients a fully executed and completed contract. § 528(a)(2).  Its advertisements failed to clearly and conspicuously disclose that its services were with respect to bankruptcy relief (§ 528(a)(3)) and did not include the required statement regarding debt relief

-17-

agencies.  § 528(a)(4).  Thus, similar violations occurred as to § 528(b) as to TADFA's internet presence.

TADFA's recent attempted compliance with §§ 526, 527 and 528 does not mitigate the damages sustained by these debtors; yet, the court acknowledges that Uhre might have been misled by the ambiguity of the statute and the court should take this into account in fixing sanctions.  Having found that TADFA's practices during the pertinent period run afoul of §§ 526(a)(3) and § 528, the court will consider appropriate damages and/or penalties under § 526.

TADFA raised the defense that §§ 527 and 528 allegedly restrict its First Amendment right to free speech.  Courts have addressed the overbreadth of the debt relief agency provisions; however, those cases dealt with application of the provisions as to attorneys.  See generally Hersh v. U.S. ex rel Mukasey, __ F.3d ___, 2008 WL 5255905 (CA5 Dec. 18, 2008)(judgment of District Court reversed that § 526(a)(4) was unconstitutional); Milavetz, Gallop & Milavetz, P.A. v. United States, 541 F.3d 785 (CA8 2008)(§ 526(a)(4) held substantially over-broad and unconstitutional as applied to attorneys providing bankruptcy assistance to assisted persons but § 528 passed constitutional muster as reasonably related to protecting consumer debtors from deceptive advertising); Connecticut Bar Ass'n v. United States, 394 B.R. 274 (D. Conn. 2008)(§ 526(a)(4) barring attorneys from advising clients to incur more debt in contemplation of bankruptcy held in violation of the First Amendment; application of § 528 to creditors' attorneys was likewise wrong but upheld the remaining provisions); Zelotes v. Adams, 363 B.R. 660 (D. Conn. 2007)(United States Trustee enjoined from enforcing § 526(a)(4) as to plaintiff attorney); Olsen v. Gonzales, 368 B.R. 886 (D. Ore. 2007)(§ 526(a)(4) held to violate attorney's First Amendment rights).  Whether §§ 527 and 528 unconstitutionally restrict a non-lawyer's First Amendment rights appears to be a question of first

impression.[20]  Based on the reasoning of the above cases dealing with lawyers, the court finds that the challenged provisions do not prohibit a substantial amount of protected speech.

## B.  The Bankruptcy Petition Preparer Counts (Counts III-VII)

Section 110 was enacted to protect consumers from abuses by non-attorneys. See In re Jolly, 313 B.R. 295, 300 (BC S.D. Iowa 2004) citing Consumer Seven Corp. v. United States Trustee ( In re Fraga), 210 B.R. 812, 816-17 (B.A.P. CA9 1997). The In re Jolly court set forth the rationale for the enactment of § 110 as follows:

> Bankruptcy petition preparers not employed or supervised by any attorney have proliferated across the country. While it is permissible for a petition preparer to provide services solely limited to typing, far too many of them also attempt to provide legal advice and legal services to debtors. These preparers often lack the necessary legal training and ethics regulation to provide such services in an adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system.

In re Jolly at 300 (quoting H.R. Rep. 103-835, 103rd Cong., 2nd Sess. at 56 (Oct.4, 1994)), U.S. Code Cong. & Admin. News 1994, pp. 3340, 3365).

Section 110(a) defines "bankruptcy petition preparer" and "document for filing" as:

> (1) "bankruptcy petition preparer" means a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation a document for filing; and

---

[20]  Inasmuch as the UST is the Plaintiff in this action, no further notice is required upon the Attorney General pursuant to Rule 5.1(a) of the Fed. Rules of Civil Proc., made applicable to bankruptcy cases by Fed. Rule of Bankruptcy Proc. 9005.1

> (2) "document for filing" means a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title.

Once determined that a person is indeed a bankruptcy petition preparer, what follows are specific requirements as well as penalties for non-compliance.

Does § 110 apply to TADFA? The issue is whether the word "preparation" applies only to the actual document that is filed with the court. If that were the intention of Congress, then all parties similar to TADFA would need to do is limit their work to the penultimate draft. The court finds that the intention of the legislation was to endow "preparation" with a broader meaning than that.

The court did not find any case where a person worked in concert with attorneys admitted to practice law in the relevant jurisdiction.[21] However, courts applied the definition of § 110(a) broadly in rendering a person a bankruptcy petition preparer. See In re McGill, 2007 WL 1119939 (BC E.D. Tenn. Apr. 13, 2007); In re Reynoso, 477 F.3d 1117, 1123 (CA9 2007); In re Springs, 358 B.R. 236, 241 n.4 (BC M.D.N.C. 2006); In re Hennerman, 351 B.R. 143, 148-49 (BC D. Colo. 2006); In re Thomas, 315 B.R. 697, 703-04 (BC N.D. Ohio 2004); In re Jolly, 313 B.R. at 301 (BC S.D. Iowa 2004); In re Pillot, 286 B.R. 157 (BC C.D. Cal. 2002); In re Willman, 1997 WL 781878 (BC E.D. Pa. Dec. 18, 1997); Ferm v. United States (In re Crowe), 243 B.R. 43 (CA9 2000); In re Landry, 250 B.R. 441 (BC M.D. Fla. 2000); In re Gaftick, 333 B.R. 177 (BC E.D.N.Y. 2005); In re Moore, 290 B.R. 287, 293 (BC

---

[21]   In the case of In re Stone, 166 B.R. 269 (BC W.D. Pa.1994), the court found that a bankruptcy petition preparer arrangement with an attorney admitted to practice in the jurisdiction whereby counsel reviewed the prepared documents did not shield the non-attorney from civil contempt liability for the continued unauthorized practice of law. The In re Stone case is distinguishable because counsel did not file or sign the documents. See also In re Doser, 281 B.R. 292 (BC D. Idaho 2002), aff'd, 412 F.3d 1056, 304-5, 309-10 (CA9 2005) (Bankruptcy Court characterized bankruptcy petition preparer's representation of providing a "supervising attorney" as deceptive and unfair and further discussed the dangers of using a workbook or questionnaire versus the official forms).

E.D.N.C. 2003); <u>In re Moffett</u>, 263 B.R. 805 (BC W.D. Ky. 2001); <u>In re Farness</u>, 244 B.R. 464 (BC D. Idaho 2000).

As demonstrated by the attached Appendix, the papers prepared by TADFA tracked the papers required for a bankruptcy filing and were easily transferred to the Schedules and Statement of Financial Affairs by the Sirody Firm. TADFA opened the door to the bankruptcy process and then led these debtors inside that process by assembling the material necessary, including ordering credit reports, to enable the Sirody Firm to actually file the cases. The court finds no competent evidence of any other function. ("We assemble the information that they return to us together with the credit reports and any other pertinent financial information and forward it to the attorneys who are going to be handling that particular individual's case." (Tr. 171, l. 20-24)).

It is abundantly clear to the court that TADFA's "bankruptcy option" was developed by Uhre in an attempt to escape the requirements of § 110. TADFA solicited those in financial peril, advised and steered most of them who could afford its fees toward bankruptcy, dangled "benefits" before them and then sold, for a hefty price, a Workbook that was the functional equivalent to bankruptcy Schedules and Statements of Financial Affairs.

Therefore, inductive reasoning (<u>i.e.</u>, "If it looks like a duck, swims like a duck and quacks like a duck, then it probably is a duck.") leads this court to find that TADFA is indeed a bankruptcy petition preparer under § 110 and subject to that section's requirements and penalties. A contrary finding would undoubtedly frustrate the legislative purpose of § 110.

> **The court requests that the parties submit a proposed schedule within 15 days from the entry of this Memorandum of Decision for the filing of memoranda with respect to the damages and/or penalties to be awarded under § 526(c)(2) and § 110 in these cases. The court may schedule a hearing to assist in its determination of the award.**

cc:     Jeanne M. Crouse
       Assistant U.S. Trustee
       6305 Ivy Lane, Suite 600
       Greenbelt, MD 20770

       Mark A. Neal
       Assistant U.S. Trustee
       101 W. Lombard Street, Suite 2625
       Baltimore, MD 21201

       The American Debt Free Association, Inc.
       c/o Curtis B. Uhre, Registered Agent
       11 N. Washington Street, Suite 210
       Rockville, MD 20850

       The American Debt Free Association, Inc.
       c/o Curtis B. Uhre
       Registered Agent77
       S. Washington Street, Suite 306
       Rockville, MD 20852

       Brian E. Barkley, Esq.
       Barkley & Kennedy, Chtd.
       51 Monroe Street, Suite 1407
       Rockville, MD 20850

       Jeffrey M. Sirody, Esq
       Adam M. Freiman, Esq.
       Sirody, Freiman & Feldman, P.C.
       1777 Reisterstown Road, Suite 360E
       Baltimore, MD 21208

Sirody, Freiman & Feldman, P.C.
c/o Jeffrey M. Sirody, Registered Agent
1777 Reisterstown Road, Suite 360E
Baltimore, MD 21208

**End of Memorandum Decision**

## Appendix

| TADFA's Workbook | Official Bankruptcy Forms |
|---|---|
| "Schedule A: Real Property" requests information as to real property owned or sold/transferred in the past two years. Information requested includes address, date of purchase, title, payment, current value, intention as to retention/surrender and loans. | "Schedule A - Real Property" (Form B6A) requests descriptions and locations of real property, the nature of the debtor's interest in same, whether the property is owned individually, jointly or community, current value and amount of secured claims.  See also "Schedule D - Creditors Holding Secured Claims" (Form B6D). |
| The "Automobiles/Trucks" page requests information regarding motor vehicles, including make, model, year, mileage, purchase price, date of purchase, title, loans, payments and intention as to retention/surrender. | "Schedule B - Personal Property" (Form B6B), question 25, requests descriptions and locations of automobiles, trucks, trailers, and other vehicles and accessories, whether the property is owned individually, jointly or community and current value. |

| "Schedule B: Other Assets" requests information as to cash on hand, checking account balances, savings account balances, names of banks/credit unions, security deposits, pending tax refunds, retirement funds, life insurance, stocks/securities/business interests, burial plots, time shares, money owed to the debtor(s), pending lawsuits, jewelry, household furnishings and clothing. | "Schedule B - Personal Property" (Form B6B) requests details as to (1) cash on hand; (2) checking, savings or other financial accounts, certificates of deposit or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives; (3) security deposits with public utilities, telephone companies, landlords, and others; (4) household goods and furnishings, including audio, video, and computer equipment; (5) books; pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles; (6) wearing apparel; (7) furs and jewelry; (8) firearms and sports, photographic, and other hobby equipment; (9) interests in insurance policies; (10) annuities; (11) interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1); (12) interests in IRA, ERISA, Keogh, or other pension or profit sharing plans; (13) stock and interests in incorporated and unincorporated businesses; (14) interests in partnerships or joint ventures; (15) government and corporate bonds and other negotiable and nonnegotiable instruments; (16)accounts receivable; (17) alimony, maintenance, support, and property settlements to which the debtor is or may be entitled; (18) other liquidated debts owed to debtor including tax refunds; (19) equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor; (20) contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust; (21) other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims; (22) patents, copyrights, and other intellectual property; (23) licenses, franchises, and other general intangibles; (24) customer lists or other compilations containing personally identifiable information provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes; (25) automobiles, trucks, trailers, and other vehicles and accessories; |
|---|---|

|  | (26) boats, motors, and accessories; (27) aircraft and accessories; (28) office equipment, furnishings, and supplies; (29) machinery, fixtures, equipment, and supplies used in business; (30) inventory; (31) animals; (32) crops - growing or harvested; (33) farming equipment and implements; (34) farm supplies, chemicals, and feed; and (35) other personal property of any kind not already listed. |
|---|---|
| "Schedule C: Priority creditors" requests information as to tax, child support, alimony, and student loans. | "Schedule E - Creditors Holding Unsecured Priority Claims" (Form B6E). |
| "Schedule D: Unsecured Creditors" requests information as to creditors holding unsecured claims such as "credit cards, personal loans, medical and dental bills, magazine clubs, health club dues, insurance bills, etc." | "Schedule F - Creditors Holding Unsecured NonPriority Claims" (Form B6F). |
| "Schedule E: Secured creditors" requests information as to creditors holding secured claims ("loans for which you pledged your car or household goods as collateral."). | "Schedule D - Creditors Holding Secured Claims" (Form B6D). |
| "Schedule F: Leases" requests information as to automobile leases and apartment leases. | "Schedule G - Executory Contracts and Unexpired Leases" (Form B6G). |
| "Schedule G" seeks information as to co-debtors. | "Schedule H - Codebtors" (Form B6H). |
| "Schedule H" seeks personal information (age, marital status, occupation, employment information, dependents). | "Schedule I - Current Income of Individual Debtor(s)" (Form B6I). |
| "Schedule I: Monthly Income" is modeled after the Official Bankruptcy Form. | "Schedule I - Current Income of Individual Debtor(s)" (Form B6I). |
| "Schedule J: Monthly Expenses,"is modeled after the Official Bankruptcy Form. | "Schedule J - Current Expenditures of Individual Debtor(s)" (Form B6J). |
| TADFA's "Statement of Financial Affairs" and the Official Bankruptcy Form are virtually identical. The exceptions are that TADFA's form omits question 16, Spouses and Former Spouses; adds a question 19 seeking information about charging more that $1,000.00 on a credit card within the past three months; and omits questions 19 through 25 that appear on the Official Bankruptcy Form. ||

-26-